**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| Dr. MICHAEL B. CANALES, | :  **Case No.** |
| | : |
| JOHN DOE 20 | :  Judge |
| Plaintiffs, | : |
| -vs- | :  **JURY TRIAL DEMANDED** |
| THE OHIO STATE UNIVERSITY, | : |
| Defendant. | : |
| | : |

## COMPLAINT

Now comes the Plaintiffs, Dr. Michael B. Canales and John Doe 20, by and through Counsel, and state that this Complaint is filed against The Ohio State University, "OSU" as a companion case to the unsettled cases of *Nutter, et al. v. The Ohio State University*, Case No. 2:19-cv-02462 and *Ratliff v. The Ohio State University*, Case No. 2:19-cv-04746. Plaintiffs have filed this separate action because they are new Plaintiffs to the litigation.

Plaintiffs, by and through counsel, state and aver their Complaint against the Defendant, The Ohio State University as follows:

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1334 as the claims are matters in controversy that arise under the laws of the United States of America. Specifically, the claims are asserted under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq* and the Civil Rights Act, 42 U.S.C. § 1983, *et seq.*

2.  Venue is proper in the Southern District of Ohio pursuant to 28 U.S.C. § 1391(b) as the events giving rise to the Plaintiffs' claims occurred within this Court's district.

## PRELIMINARY STATEMENT

3.  This is a civil rights lawsuit being brought by former students of The Ohio State University ("OSU") that are among the estimated 1,500 to 2,500 male students that were sexually assaulted, abused, molested, and/or harassed by their OSU Physician and Athletic Team Doctor, Dr. Richard Strauss, M.D.

4.  At OSU, Dr. Strauss was an employee, tenured faculty member, and the Associate Director of OSU's sports medicine program. He served as a physician in both the athletic department and the OSU student health center.

5.  Dr. Strauss' OSU career spanned over nineteen (19) years from approximately 1979 through 1998. Throughout his approximate nineteen (19) years at OSU as both a physician in the athletic department and in the student health center, Dr. Strauss used his position of trust and confidence as a physician to sexually molest, sexually assault, sexually abuse, and/or sexually harass countless OSU male student-athletes and students.

6.  The Plaintiffs consented to receiving medical treatment from Dr. Strauss while student athletes and students at OSU. However, these student-athletes and students never consented to Dr. Strauss' sexual molestation, sexual assault, sexual abuse, and/or sexual harassment as Dr. Strauss frequently went beyond the stated medical purpose of their examinations, and their examinations often were not consistent with the standard of care for medical examinations.

7. Dr. Strauss was designated the team physician for many sports centered out of Larkins Hall, including men's wrestling. As such, student-athlete wrestlers were susceptible to Dr. Strauss if they wanted to receive medical treatment.

8. Larkins Hall was home to the OSU Varsity Wrestling Team as their practice facility. The wrestling locker room was located on the main floor, inside the general men's locker room. The wrestling locker room had a separate locked area with lockers located around the outside walls of the room. Also, the wrestlers shared a shower area, toilet area, and sauna area with the general OSU population that included students, employees, faculty members, and staff of OSU. Further, the wrestlers would walk across a hallway to access their training room which was located on the main floor of Larkins Hall. This training area had approximately six (6) training tables, approximately two whirlpools, and a private office area where the wrestlers would meet with Dr. Strauss. Further, most wrestlers accessed the wrestling room by walking up a private spiral staircase located at the end of the hallway that separated the locker room and training room. This spiral staircase ascended to the third floor wrestling room.

9. After wrestling practice, the wrestlers would shower in the first floor general shower area. Here, wrestlers were often harassed not only by Dr. Strauss, but also by numerous students, employees, faculty members, and/or staff. These individuals harassed the wrestlers by leering and/or voyeuristically staring at the wrestlers while they showered. These individuals sometimes would shower with the wrestlers, stare at the wrestlers, and excessively lather their genital area. Moreover, some of these individuals became erect in the shower area and even masturbated while in the shower area. Also, some

individuals voyeuristically stared at the wrestlers from inside a bathroom stall by looking through a crack in the door or by voyeuristically looking over the bathroom stall door.

10. The OSU wrestlers would frequently use the sauna facilities at Larkins Hall, which was part of the general men's locker room. While using the sauna facilities, Dr. Strauss and other students, employees, faculty members, and/or staff would voyeuristically watch the wrestlers.

11. In the locker room, shower area, toilet area, and/or sauna facilities, wrestlers were solicited for dates and sexual encounters.

12. Members of the OSU wrestling team and OSU coaching staff consistently discovered male on male sexual encounters in the locker room, bathroom, sauna facilities, spiral staircase, and wrestling room.

13. Further, each wrestler had to participate in a pre-season physical before the wrestler was cleared to participate in their sport. Many times, these pre-season physicals were held in the training room at the Woody Hayes Athletic Center. During the pre-season physicals, wrestlers would participate in a number of stations that included a station for blood pressure, a station to check their reflexes, a station to make a mouthpiece, etc. The final station would be a hernia examination with Dr. Strauss.

14. As students progressed through the stations, the hernia station always took the longest. Here, Dr. Strauss would excessively fondle and inspect the genitals and anuses of wrestlers. These exams lasted approximately five (5) minutes to fifteen (15) minutes.

15. Dr. Strauss would give explanations for the prolonged need for his medical exams. Frequently, Dr. Strauss would tell wrestlers that he was just being thorough, needed to

check their lymph nodes, needed to check for STDs, and/or that he was checking for testicular cancer.

16. Typically for a pre-season physical, Dr. Strauss would ask the wrestler to enter the room. Dr. Strauss would shut the door and ask the wrestler to undress. Dr. Strauss would exam the wrestler from his shoulders to his groin area. Dr. Strauss would closely look at the wrestler's skin, lifting the wrestler's arms and running his hands down the wrestler's chest. Then, Dr. Strauss would grab a stool on wheels and roll up to the wrestler's groin area so the wrestler's penis was at the height of Dr. Strauss' facial area. Sometimes, Dr. Strauss would turn off the lights and would use a purplish light headlamp to examine the wrestler. Either way, Dr. Strauss' face was close enough that the wrestler could feel his breath on his penis and testicles. Typically, Dr. Strauss would hold the wrestler's testicles in his left hand and he gently massaged the wrestler's testicles. With his right hand, Dr. Strauss would hold the wrestler's penis and move the wrestler's penis in different directions so as to appear to be examining the shaft of the wrestler's penis. Dr. Strauss would continue this examination with the wrestler for approximately five (5) minutes to fifteen (15) minutes. Once completed, occasionally, Dr. Strauss would ask the wrestler to turn around. Dr. Strauss would instruct the wrestler to put his hands on his buttocks and spread the wrestler's buttocks. Then, Dr. Strauss would instruct the wrestler to cough. During this anus examination, Dr. Strauss would still be on his stool with the wrestler's buttocks approximately one (1) foot from Dr. Strauss' face. Dr. Strauss failed to use examination gloves during the pre-season physicals.

17. In April 2018, OSU authorized an independent investigation into whether Strauss had sexually abused students-athletes, and if so, the extent to which OSU knew about Strauss' conduct. The law firm of Perkins Coile, LLP conducted approximately a yearlong independent investigation that interviewed over five hundred (500) individuals with a cost to OSU of over six (6) million dollars. On May 15, 2019 Perkins Coie, LLP issued a report with findings from its independent investigation into Struass' acts of sexual abuse and the degree to which OSU knew of or permitted Strauss to abuse OSU students, titled, *Sexual Abuse Committed by Dr. Richard Strauss at the Ohio State University,* issued on May 15, 2019. This report substantiated many of the facts that are pled in this Complaint and the previous Consolidated Complaints pending before this Court. The Perkins Coie report found that Dr. Strauss had sexually abused at least 177 male student-patients that he was charged with as a University Physician and that the University personnel had knowledge of Strauss' sexually abusive treatments of male student patients as early at 1979, but that complaints and reports about Strauss' conduct were not elevated beyond the Athletics Department or Student Health until 1996.

18. The Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act (known as the Clery Act) signed in 1990 is a federal statute codified at U.S.C.§ 1092 with implementing regulations in the U.S. Code of Federal Regulations at 34 C.F.R. 668.46. This federal statute requires U.S. colleges and universities participating in federal financial aid programs to maintain and disclose campus crime statistics and security information on or around their campuses. The Act is enforced by the U.S. Department of Education. As a result of the Clery Act, OSU has been required to file

annual security reports since 1991. Even though OSU Team Doctor and Employee Dr. Strauss had been sexually harassing and molesting OSU male athletes and male students since 1979, OSU never reported these sexual abuses till 2019 when OSU reported in 2018 that there were thirty (30) incidents of rape on campus by Dr. Strauss and nine hundred ninety two (992) incidents of fondling on the OSU campus by Dr. Strauss. 19. The Clery Act also requires universities to send timely warnings to their university community when there are known risks to public safety on campus. By October of each year, universities must publish and distribute their annual campus security report. This report is required to provide crime statistics for the prior three years, policy statements regarding various safety and security measures, campus crime prevention program descriptions and procedures to be followed in the investigation and prosecution of alleged sex offenses. On or about December 17, 2020, OSU reported in its annual crime report that the Dr. Strauss related Columbus-campus data included incidents reported in 2018 and 2019. To date, OSU has reported two thousand two hundred and one (2,201) instances of fondling and one hundred and twenty-seven (127) instances of rape attributable to Dr. Strauss.

19. As categorized by the Perkins Coie Report issued on May 15, 2019, Strauss abused Plaintiffs and other OSU students in one or more of the following ways:

    a. In the context of a medical examination that caused the student to reach ejaculation or nearly ejaculation;

    b. In the context of a medical examination that caused the student to reach erection or near erection;

     c. Unnecessary fondling or groping of the genitals in the context of a medical examination, or medically unnecessary examinations of the genitals or rectum;

     d. Examination techniques that included: unnecessary nudity, excessive touching of non genital/ non-rectal areas of the student's body; inappropriate verbal commentary or sexually charged questioning; lack of medical gloves for genital examinations; unnecessarily invasive physical positions; medical treatment outside of a clinical setting; and *quid pro quo* arrangements; and

     e. Inappropriate and sexually abusive conduct outside of the examination room, including showering alongside student-patients, loitering in student athlete's locker rooms and engaging in voyeuristic behavior, and initiating fraternization with patients. (See Perkins Coie Report p. 40).

20. Even though the Perkins Coie Report released on May 15, 2019 reflects the significant number of OSU people in 2018 and 2019 who admitted to the investigators that they knew about Dr. Strauss' disgusting sexual tendencies, there are nonetheless many other OSU employees and agents who did not admit to knowing about Dr. Strauss due to memory lapses, death, mental disability, selective amnesia, or a failure to cooperate with the investigators of Perkins Coie for the fear of their own potential personal liability for failure to report or disclose the abusive or sexual misconduct by Dr. Strauss.

21. The Perkins Coie investigation and report disclosed that at least the following OSU officials received reports about Dr. Strauss. Two (2) OSU Athletic Directors, Two (2) OSU Head Team Physicians, Six (6) OSU Assistant Athletic Directors, Five (5) OSU Team Physicians, Twenty-Two (22) OSU Coaches, One (1) OSU Athletic Training

Director, Four (4) OSU Athletic Trainers, Eighteen (18) OSU Student Trainers, Four (4) OSU Student Health Officials and , Three (3) OSU Student Health Employee. In addition, there was an unknown number of OSU personnel executives, lawyers, trustees, and/or OSU officials that were aware of the complaints against Strauss.

22. The name of the OSU officials that received reports or student complaints about the sexual conduct of Dr. Strauss include but are not limited to the following:

    a.  OSU Athletic Director, Jim Jones;

    b.  OSU Athletic Director and Assistant University Vice President, Andy Geiger;

    c.  OSU Assistant Athletic Director Kate Riffee;

    d.  OSU Head Medical Director and Head Team Physician Dr. John Lombardo;

    e.  Assistant OSU Athletic Director Archie Griffith;

    f.  Assistant OSU Athletic Director Larry Romanoff;

    g.  OSU Vice President David Williams;

    h.  OSU Head Team Physician and Director of Sports Medicine Dr. Bob Murphy;

    i.  Associate OSU Athletic Director Paul Krebs;

    j.  OSU Student Health Director Dr. Forrest Smith;

    k.  OSU Tennis Team Physician Trent Sickles;

    l.  OSU Student Health Center Sports Medicine Clinic Director David Henderson;

    m.  OSU Director of Athletic Training Bill Davis;

    n.  OSU Director of Student Dr. Ted Grace;

    o.  OSU Head Fencing Coach Charlotte Remenyik;

    p.  OSU Head Wrestling Coach Russ Hellickson;

    q.  OSU Head Assistant Wrestling Coach Jim Jordan;

r. OSU Head Trainer Vince O'Brien;

s. OSU Track and Field Coach Frank Zubovich;

t. OSU Swimming Coach Dick Sloan;

u. OSU Athletic Director Hugh Hindman;

v. OSU Assistant Athletic Director Richard Delaney;

w. OSU Co-Head Athletic Trainer Billy Hill

x. OSU Athletic Academic Counselor James Hall

y. OSU Head Basketball Trainer Mike Bordner.

23. On May 17, 2019 OSU President Dr. Michael Drake and OSU Board of Trustees Chair Michael Gasser issued a letter to members of The Ohio State University that stated the findings of the independent investigation were shocking and painful to comprehend. The two OSU leaders offered their profound regret and sincere apologies to each person that endured Dr. Strauss' abuse, and for the OSU's fundamental failure at the time to prevent the abuse. They further stated that university personnel at the time had knowledge of complaints and concerns about Dr. Strauss' conduct, as early as 1979 but failed to investigate or act meaningfully. In addition, they stated that "On behalf of the university, we offer our profound regret and sincere apologizes to each person who endured Dr. Strauss' abuse and for our institution's fundamental failure at the time to prevent the abuse."

24. Once the Perkins Coie Investigative report was released on May 15, 2019 and the letter from the OSU President Dr. Michael Drake and OSU Board of Trustees Chair Michael Gasser was released on May 17, 2019 which resulted in extensive nationwide media coverage, the Plaintiffs came to the following realizations:

    a. Dr. Strauss' conduct during the physical and medical examinations was not medically necessary and was in fact sexual assault;

    b. There was a tremendous magnitude and widespread scope of sexual abuse to OSU students by Dr. Strauss;

    c. OSU had knowledge of Dr. Strauss' sexual abuse of male students for decades and chose to ignore this sexual abuse;

    d. OSU had received repeated and numerous complaints about Dr. Strauss and his prolonged genital examinations and other disturbing sexual inclinations and proclivities but OSU took no actions against him;

    e. OSU Athletic Directors Assistant, Assistant Athletic Directors, Coaches, Trainers, Administrators, Physicians, Deans and other OSU employees all knew about the complaints and reports made by OSU students and did nothing; and

    f. The plaintiffs were not the only ones sexually molested and sexually assaulted but many, many other OSU students had been sexually assaulted, raped, sodomized, groped, fondled, masturbated, digitally penetrated, and emotionally scarred between 1979-1998 due to OSU's total and deliberate indifferences to the actions of Dr. Straus. As stated in the OSU Letter of May 17, 2019 there was a "fundamental failure at the time to prevent the abuse."

25. Plaintiff John Doe 20 has filed anonymously in this action due to the highly personal nature of the circumstances giving rise to his claims.

26. Plaintiffs take no pleasure in bringing this lawsuit. OSU is an esteemed institution of higher learning and a large majority of the Plaintiffs continue to love OSU dearly and remain devoted members of The Buckeye Nation. As such, Plaintiffs have an

extremely difficult time understanding how the state up north as well as the University of Southern California can fully acknowledge and compensate the victims/survivors of sexual abuse, whereas a leading Big 10 institution such as OSU has struggled to do so.

27. Plaintiffs who were OSU athletes were honored to represent OSU in competitive NCAA Division I athletics and did their best to continue the University's tradition of excellence.

28. Plaintiffs honorably attended OSU expecting the University would provide them with a safe and supportive environment that would help them perform both academically and athletically.

29. Plaintiffs believed that OSU Team Physicians like Dr. Strauss held a special relationship of trust and confidence with their student-patients. These physicians become even more important to a NCAA Division I athlete as a student-athlete requires immediate treatment in order to compete in the rigors of their respective sport.

30. Plaintiffs trusted OSU to act in their best interests when selecting, training, and supervising the team physicians on its faculty, which included the need to regularly and competently evaluate the quality of care and the integrity of the medical services that Dr. Strauss provided to OSU's students and athletes.

31. Plaintiffs trusted that OSU personnel would not conceal, disclose, or disregard known circumstances that raised a substantial likelihood that Plaintiffs would be sexually molested, sexually assaulted, sexually abused, and/or sexually harassed by Dr. Strauss. Likewise, the Plaintiffs trusted that OSU personnel would not conceal, disclose, or disregard known circumstances that raised a substantial likelihood that Plaintiffs would be sexually harassed and sexually abused at the athletic facility of Larkins Hall.

32. However, instead of taking action to stop Dr. Strauss' sexual abuse, OSU not only turned a blind eye to his sexual abuse, but facilitated the abuse, and concealed the abuse. OSU required its student-athletes to see Dr. Strauss for annual physicals and medical treatment in order to participate in university sports and maintain their athletic scholarships, even after student athletes complained to their coaches about the ways Dr. Strauss touched them during medical examinations. At least one coach threatened athletes with having to see Dr. Strauss if they did not listen to the coach.

33. OSU administrators and employees of Student Health Services also facilitated and concealed Dr. Strauss' abuse. For example, after a student lodged a complaint detailing Dr. Strauss's inappropriate sexual touching and comments during an examination, the Director of Student Health Services legitimized the abuse and concealed the abuse by telling the student that no one had complained about Dr. Strauss before and that Dr. Strauss had said the examination was medically appropriate.

34. At all times relevant to this complaint, OSU officials with the authority to institute corrective measures actively concealed, failed to disclose, and showed deliberate indifference towards circumstances that indicated Dr. Strauss was sexually abusing male student-athletes and students.

35. At all times relevant to this complaint, OSU personnel failed to implement corrective measures despite having actual knowledge Dr. Strauss was sexually abusing students and Larkins Hall presented a sexually hostile environment to male student athletes.

36. OSU officials knowingly, intentionally, and/or recklessly aided, abetted, and/or concealed and covered up for Dr. Strauss' sexual predation on its student-athletes and students. OSU ignored complaints and disregarded commonly known information and

improper and/or inappropriate practices used by Dr. Strauss over his nineteen (19) year career.

37. Only within in the past two years have Plaintiffs realized that Dr. Strauss' conduct constituted sexual assault/abuse and within the past two years have Plaintiffs had a reasonable basis for believing that OSU had actual knowledge of the risk Strauss presented to the student/athletes that he examined and/or treated.

38. Only with the past two years have the Plaintiffs had a reasonable basis for believing that OSU intentionally concealed, covered up, and/or showed deliberate indifference to the threat Dr. Strauss posed to the students and athletes as well as the OSU administrators in a position to take corrective action and/or measures regarding the sexual harassment environment that the Plaintiffs suffered in Larkins Hall on a daily basis.

39. OSU, independently of Dr. Strauss and his actions, has harmed the Plaintiffs by failing to protect the Plaintiffs from Dr. Strauss, even though OSU knew that Dr. Strauss may be a sexual predator.

40. Only within the past two years have Plaintiffs been able to infer what OSU knew about Dr. Strauss, OSU's concealment of Dr. Strauss, OSU's cover up of Dr. Strauss, OSU's deliberate indifference toward Dr. Strauss and their own sexually harassing environment, and the extent of how OSU acted or failed to act with said information.

## **PARTIES**

41. The Plaintiffs hereby incorporate by reference the allegations set forth and contained in Paragraphs One (1) through Paragraphs Forty (40) as if fully written herein.

42. Defendant The Ohio State University (hereinafter referenced as OSU) was at all relevant times contained herein and presently continues to be a public university organized and existing under the laws of the State of Ohio.

43. Defendant OSU received at all relevant times contained herein and presently continues to receive federal financial assistance, which subjects OSU to Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, *et seq.* and the Civil Rights Act, 42 U.S.C. § 1983, *et seq.*

44. At all relevant times herein, Plaintiffs were enrolled at OSU as students during Dr. Strauss' employment with OSU.

### DR. MICHAEL B. CANALES

45. Plaintiff Dr. Michael B. Canales is a resident of Hinkley, Ohio. He is a 1995 graduate of Brecksville-Broadview Heights High School, where he was a 1995 USA Gymnastics Champion and four-time (4x) OHSAA State Champion.

46. Plaintiff Canales attended OSU from the years of 1995-1999, graduating with a Bachelor of Science degree in Molecular Genetics. While at OSU, Plaintiff Canales was a four (4) year member of the varsity gymnastics team. He was a 1999 Corwin Fergus Memorial Award Winner, 1999 Big Ten Conference Medal of Honor Finalist, OSU Scholar-Athlete 1995-1999, 1996 NCAA National Champions, 1996 Big Ten Conference Champions, 1997 Big Ten Conference Champions, as well as a 1995-1997 U.S. Jr. National Team Member.

47. Plaintiff Canales was examined at least three (3) times by Dr. Strauss for a physical injury and/or sickness and Dr. Strauss sexually assaulted him on all three (3) occasions.

48. Every examination consisted of Dr. Strauss excessively fondling Plaintiff Canales testicles in one of Dr. Strauss' hands as Dr. Strauss maneuvered Plaintiff Canales' penis in Dr. Strauss' other hand. The exams involved Dr. Strauss trying to arouse Plaintiff Canales.

49. Plaintiff Canales states that Dr. Strauss would regularly inquire about his sexual activity.

50. During these sexual assaults, Dr. Strauss offered to write Plaintiff Canales a letter of recommendation to enable Plaintiff Canales to pursue a career in medicine.

## JOHN DOE 20

51. Plaintiff John Doe 20 is a resident of Columbus, Ohio. He graduated from Upper Arlington High School. While in high school, Plaintiff John Doe 20 was an OHSAA state placer.

52. Plaintiff John Doe 20 attended OSU and graduated with a Bachelor of Science Degree in Health and Sciences. He was a five (5) year member of the OSU Varsity Wrestling Team, two (2) time Big Ten Placer and an Olympic Trials Placer.

53. Plaintiff John Doe 20 states that he was examined by Dr. Strauss for various illnesses/injuries over thirty (30) times in his career at OSU and Dr. Strauss attempted to masturbate him on at least six (6) different occasions. During these examination, Dr. Strauss would attempt to manipulate Plaintiff Doe 20's penis in an excessive manner in order to arouse his penis.

54. Plaintiff John Doe 20 states that Dr. Strauss never wore medical gloves during any of his examinations.

55. Plaintiff John Doe 20 states that Dr. Strauss always seemed to be the first guy into the showers and the last guy to leave the showers at Larkins Hall. Also, on numerous occasions, Dr. Strauss would leave to take a second shower if a new group of athletes entered the shower area.

## FACTS

56. The Plaintiffs hereby incorporate by reference the allegations set forth and contained in Paragraphs One (1) through Fifty-Three (53) as if fully written herein.

57. Defendant OSU employed Dr. Richard Strauss, M.D., as a faculty member from approximately September 1978 until approximately March 1, 1998.

58. In approximately September 1978, Dr. Strauss started with OSU as an Assistant Professor in the College of Medicine. Months later, Dr. Strauss was volunteering with the University Athletics Department as a team physician for several teams located in Larkins Hall.

59. By approximately 1980, Dr. Strauss was serving as an Associate Director of the Sports Medicine program.

60. By approximately 1981, Dr. Strauss began an appointment in the Athletics Department, including medical responsibilities at the Sports Medicine Clinic located in the University's Student Health Services.

61. Over the years, Dr. Strauss' responsibilities as a team physician expanded beyond Larkins Hall to other athletic facilities, which included: the Woody Hayes Athletic Center, Ernie Biggs Athletic Training Facility, and St. John Arena. Moreover, Dr. Strauss treated patients at Student Health Services.

62. Dr. Strauss was granted tenure by OSU as an associate professor in approximately 1983.

63. Dr. Strauss was granted a full professor with tenure by OSU in approximately 1992.

64. In addition to his above duties, in approximately 1994, Dr. Strauss also began a part-time appointment treating students on the third floor of Wilce Student Health Center.

65. In approximately March 1998, Dr. Strauss voluntarily retired and was granted Emeritus Status by the OSU Board of Trustees in the School of Public Health. Dr. Strauss' Emeritus Status was bestowed upon him despite the lack of review or approval from the Dean of the College of Medicine and Public Health.

66. Over his career, Dr. Strauss treated male student-athletes in the following sports: swimming, diving, wrestling, gymnastics, fencing, lacrosse, hockey cheerleading, volleyball, soccer, track, golf, baseball, tennis, water polo, and football.

67. During the above stated times and/or years and while working for Defendant OSU, Dr. Strauss sexually abused the Plaintiffs and other OSU Students under the guise of medical treatment during their medical examination in one or more of the following ways:

    a. Dr. Strauss extremely manipulated or stimulated his student-patient's genitals, which included unwanted oral sex, anal digital penetration, masturbation, attempted masturbation, and fondling that caused ejaculation or near ejaculation;

    b. Dr. Strauss fondled the student-patient to the point of erection or near erection;

    c. Dr. Strauss performed prolonged and/or medically unnecessary genital and rectal exams;

     d. Dr. Strauss committed other inappropriate and abusive practices toward his student-patients such as unnecessary nudity of the student-patient, excessive touching and/or groping of the student-patient, verbal commentary and inappropriate questions, lack of examination gloves, inappropriate physical position and/or invasion of space of the student- patient, performing treatments outside of a clinical setting, and "quid pro quo" arrangements with the student-patient; and

     e. Dr. Strauss inappropriately showered alongside student-patients, loitered in student-athletes locker rooms, engaged in voyeuristic behavior, and initiated fraternization with student-patients by calling their residences, inviting them to lunch/dinner and paying for their meals, and asking to take pictures of the student-patients to help them start a modeling career.

68. Strauss committed the above-mentioned acts of sexual abuse and sexual harassment consistently on an almost daily basis as an OSU faculty member and OSU athletic team physician.

69. As set forth below, Plaintiffs as student-patients were vulnerable to Strauss' sexual abuse and the student-patients were not able to identify Strauss' conduct as sexual abuse when it occurred.

70. Plaintiffs were treated by Dr. Strauss in his official capacity as an OSU Team Physician and/or medical doctor working for OSU.

71. Plaintiffs had little and/or no experience with medical doctors and/or examinations without their parents being present. Plaintiffs were taught to respect their elders and

were under the belief that an OSU Team Physician and/ or medical doctor working for OSU had their best health interest in mind during their examination.

72. The Plaintiffs who were OSU athletes attributed and/or rationalized Dr. Strauss' inappropriate behavior as being the thoroughness needed for participation in NCAA Division I Athletics, which said Plaintiffs knew they had to undergo a pre-season physical in order to participate.

73. Plaintiffs were sexually assaulted and/or abused by Dr. Strauss under the guise of legitimate medical examinations. Plaintiffs came into contact with Dr. Strauss under legitimate circumstances and were more likely to interpret what took place in the examination room within the same framework of legitimacy.

74. Plaintiff OSU Athletes were compliant with the Dr. Strauss as their OSU Team Physician in order to regain their good health to compete, in order to be cleared to compete, and/or represent OSU to the best of their ability.

75. Plaintiffs OSU Athletes were not educated nor taught that male sexual abuse could exist even within the confines of the OSU Athletic Department. Further, male sexual abuse was not a commonly acknowledged problem or commonly discussed among non-educators or people outside the medical field.

76. Dr. Strauss preyed upon the Plaintiffs with his superior medical knowledge and was able to dispel any of the Plaintiffs' objections with this knowledge. Plaintiffs did not have the education and/or experience in the medical field to limit Dr. Strauss' physical contact during their examinations.

77. Plaintiffs believed and trusted OSU. Plaintiffs believed OSU would protect, inform, and/or remove them from harmful situations, even if it involved their Team Physician

and/or an OSU medical doctor. Plaintiffs attended OSU with the expectation that the University would consistently provide them with a safe and supportive environment that would help them thrive.

78. Plaintiff OSU Athletes believed that accusing an OSU Professor and/or Team Physician of committing sexual assault would risk their status on the team and/or their athletic scholarship as well as their status as a student at OSU. The non-athletes Plaintiffs believed that accusing an OSU Professor and/or Team Physician of committing sexual assault would risk their status as a student at OSU.

79. Plaintiff OSU Athletes feared being ridiculed and/or ostracized if they complained to their teammates and the teammates failed to report similar experiences.

80. Plaintiffs had no options in their treatment. OSU provided their medical staff and facilities. Plaintiffs needed to see Dr. Strauss not only to heal quickly, but also, to save time, and/or money, as well as to be cleared to compete for OSU.

81. None of the Plaintiffs were trained or educated as to what constitutes inappropriate physical conduct in a doctor/patient relationship. Also, none of the Plaintiffs were educated and trained in what comments or questions are inappropriate for a physician to make during a medical examination. This would include a lack of training in diagnosing or treating hernias, swollen lymph nodes, or any other medical condition that may involve the penis, testicles, rectum, prostate, and/or anus.

82. OSU led Plaintiffs to believe that Strauss' sexually abusive examinations, methods, and statements were medically acceptable behavior and/or practices. Although the Plaintiffs had a strong inclination that Dr. Strauss' exams were medically

inappropriate, these feeling were not facts. Thus, not within the past two years did Plaintiffs appreciate that Dr. Strauss had touched them in an unlawful manner.

83. As previously alleged not until 2019, did Plaintiffs have a reasonable basis for believing that OSU had actual knowledge that Dr. Strauss was sexually abusing male students in a clinical setting.

84. As previously alleged not until 2019 did Plaintiffs have a reasonable basis for believing that OSU concealed or remained deliberately indifferent to the substantial risk that Dr. Strauss was sexually abusing them and other OSU male students.

85. As previously alleged, not until 2019, did Plaintiffs have any reasonable way of knowing that OSU had actual knowledge that Dr. Strauss was sexually abusing male student-athletes and students in a clinical setting. Plaintiffs had no way of learning what and when OSU knew about Dr. Strauss and/or how OSU chose to permit continued sexual abuse by Dr. Strauss. Plaintiffs could not have exercised reasonable due diligence that would have revealed how OSU's acts and omissions caused Plaintiffs to suffer independent injuries from the injuries caused by Dr. Strauss.

86. OSU had a deliberate indifference toward Dr. Strauss' conduct as student-athletes, students, and a few OSU staff reported and referred complaints about Dr. Strauss to various OSU officials and employees throughout Dr. Strauss' career but OSU did nothing.

87. At all relevant times in regard to this Complaint, and on information and belief, OSU staff and/or employees with authority to stop Dr. Strauss' access to patients failed to prevent Dr. Strauss from sexually abusing patients in a clinical setting, and/or implement other corrective measures as OSU had actual knowledge that there was a

substantial likelihood that Strauss was sexually assaulting and abusing male student-athletes and male students. Moreover, OSU had actual knowledge that Dr. Strauss posed a substantial risk of sexual abuse as early as 1979.

88.   OSU employees in the Sports medicine program and the Athletics Department had actual knowledge that Dr. Strauss was conducting prolonged genital exams and that Dr. Strauss refused to allow athletic training staff to be present during such exams.

89.   OSU, through its own administrators, faculty, and staff, had actual notice of Dr. Strauss' sexual abuse of male student-athletes and students. Yet, OSU denied, dismissed, disregarded, minimized, refuted, silenced, and even concealed complaints about Dr. Strauss' sexual misconduct. Even though OSU had evidence that Dr. Strauss was a substantial risk to their male student-athletes and male students, OSU failed to act. On Plaintiffs information and belief, OSU willfully allowed Dr. Strauss to prey amongst its male student-athletes and male students, even though many high ranking officials such as Athletic Directors, Assistant Athletic Directors, Associate Athletic Directors, Head Team Physicians, Team Physicians, and Athletic Trainers could have taken action to prevent this systemic sexual abuse.

90.   Further, nurses at Student Health Services made various complaints regarding Dr. Strauss. These complaints were that Dr. Strauss showed up unannounced to treat patients, performed prolonged examinations behind closed doors, and failed to chart and/or fill out medical records, which was and continues to be a standard medical practice in order to document a patient's medical history and provide follow-up care.

91.   Plaintiffs believe this lack of medical documentation is troubling and OSU allowed Dr. Strauss to continue to disregard charting and/or filling out of important medical

documentation. This lack of documentation allowed Dr. Strauss to misrepresent the nature of a patient's visit and/or allowed Dr. Strauss to deny whether he even examined the said patient.

92. OSU also failed to direct Strauss to stop showering and/or sharing a locker room with their male student-athletes, failed to direct a third person from the training staff to be present when treating their male student-athletes, failed to properly investigate any of reports and/or rumors, and failed to have a meaningful sexual abuse policy for its students.

93. Simply put, OSU failed its male student-athletes and male students from the years 1979- 1998 as OSU had actual knowledge that their employee and faculty member, Dr. Strauss, was a sexual predator and OSU was deliberately indifferent to these facts.

94. Additionally, OSU failed to address the sexual harassment in its athletic facility at Larkins Hall.

95. Larkins Hall was home to many sports such as swimming, diving, gymnastics, fencing and wrestling.

96. In Larkins Hall, the OSU Varsity Wrestlers were victims of a harassing environment that allowed OSU's faculty, staff, and students to voyeuristically leer and/or stare at these wrestlers as they showered or used the sauna facilities.

97. Further, male on male sexual interactions were frequent in areas of Larkins Hall that were frequented by the OSU wrestling team. There were instances of male on male sexual encounters in the bathroom, the sauna, the private winding stairwell entrance to the wrestling room, the wrestling room, and the bathroom in the hallway outside of the wrestling room.

98. The OSU Wrestling Coaches repeatedly tried to secure a separate shower facility for their wrestlers and/or move their wrestlers into a separate facility. Further, in approximately 1995, two wrestlers approached OSU Athletic Director Andy Geiger with schematic drawings to separate the wrestlers into their own space. OSU Athletic Director reported to the wrestlers that these plans would be too expensive. As a concession, the OSU Athletic Department Andy Geiger cleaned the wrestling locker room carpets that week.

99. The wrestling coaches consistently asked for better accommodations as the Larkins Hall sexual harassment environment seriously impacted the psyche and morale of the OSU Wrestling Team. The OSU wrestling coaches would even address the team as to this issue and continually informed the wrestlers that the OSU wrestling coaching staff was doing everything the staff could do to remove the team from the sexual harassment.

100. Dr. Strauss was a part of the sexual harassment environment of Larkins Hall. Dr. Strauss took long showers with the wrestling team. During these showers, Dr. Strauss would voyeuristically stare at the wrestlers. After his shower, Dr. Strauss would enter the wrestling locker room and position himself to leer at the wrestlers as he patted himself dry. Additionally, he would use the sauna facilities with the wrestlers and voyeuristically watch them. Dr. Strauss' showering obsession was to the point that he would sometimes reduce his examination times to allow him to shower. Moreover, many wrestlers saw Dr. Strauss take more than one shower in a short amount of time, which allowed Dr. Strauss to voyeuristically gaze at his "favorite wrestlers."

101. On or about March 13, 2020, Dr. Ted Grace was deposed by special outside counsel for the State Medical Board of Ohio regarding Dr. Richard Strauss and the failure of physicians to report Dr. Strauss to the State Medical Board of Ohio.  In his deposition, Dr. Grace stated that he was the Director of Student Health Services at the Ohio State University from on or about August 1992 through in or about 2007.  As Director of Student Health Services, Dr. Grace was responsible for overseeing all employees at the Student Health Center, including the physicians who provided medical care to patients. Dr. Strauss was one of the physicians who treated patients at the Student Health Center during Dr. Grace's tenure.

102. Prior to Dr. Grace assuming his position as Director of Student Health Services at the Ohio State University, he had heard that a physician at OSU had been "touching athletes" and that this rumor was so widespread throughout the college health community that it "went clear across the country" to reach Dr. Grace in California. Further, Dr. Grace became aware of at least three separate complaints against Dr. Strauss involving different male students who were seen for medical appointments with Dr. Strauss at the Student Health Center while Dr. Grace was Director.  After the receiving the second complaint, Dr. Grace gave Dr. Strauss a "verbal warning."  Also, Dr. Grace stated that the Student Health Center implemented a special consent form used exclusively for male patients being treated by Dr. Strauss regarding the option of a chaperone.  After the third complaint regarding Dr. Strauss from a male complainant, Dr. Grace suspended Dr. Strauss from seeing patients at the Student Health Center, yet Dr. Grace failed to report any of these complaints to the State Medical Board of Ohio.

On or about April 2, 2021, Ted W. Grace, M.D., executed a Surrender of his license to practice medicine and surgery in Ohio with consent to permanent revocation.

103. On or about September 22, 2020, an Ohio Court of Claims Special Master determined that Ohio State University violated state public records law when it denied timely access to records requested by a former student and victim of Dr. Strauss. These violations stem from OSU's failure to provide records in December 2018 when the former student and victim of Dr. Strauss sought documents, communications, and other information related to actions taking pertaining to Dr. Strauss and other OSU administrators during the calendar years of 1994 to 1996.

104. OSU had actual knowledge that their OSU Varsity Wrestling Team was being sexually harassed in Larkins Hall and OSU was deliberately indifferent to these facts. Even though OSU knew of Larkins Hall's sexually hostile environment, OSU took zero steps to protect their student-athletes.

105. OSU had actual knowledge that their employee and faculty member, Dr. Strauss, was showering and using the wrestling locker room as well as other male sports' locker rooms in Larkins Hall and OSU was deliberately indifferent to these facts.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION – VIOLATIONS OF TITLE IX, 20 U.S.C. § 1681(a), *et seq.*

106. The Plaintiffs hereby incorporate by reference the allegations set forth and contained in Paragraphs One (1) through Paragraphs One Hundred and Two (102) as if fully written herein.

107. Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1631(a), states: "No person in the United States shall, on the basis of sex, be excluded from

participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance...."

108. Title IX is implemented through the Code of Federal Regulations. See 34 C.F.R. Part 106.34 C.F.R. § 106.86(b) provides:"...A recipient shall adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by this part."

109. As explained in Title IX guidance issued by the U.S. Department of Education's Office for Civil Rights, sexual harassment of students is a form of sex discrimination covered by Title IX.

110. Title IX covers all programs of a school that receives any federal financial assistance, and covers sexual harassment, including sexual assault, by school employees, students, and third parties.

111. Sexual harassment is defined as unwelcome conduct of sexual nature, including unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature when either:

    a. the conduct is made as a term or condition of an individual's employment, education, living environment or participation in a University community;

    b. the acceptance or refusal of such conduct is used as the basis or a factor in decisions affecting an individual's employment, education, living environment, or participation in a University community;

    c. the conduct unreasonably impacts an individual's employment or academic performance or creates an intimidating, hostile or offensive environment for that

individual's employment, education, living environment, or participation in a University community.

112. At all relevant times contained herein, OSU received federal financial assistance. As a result, OSU is subject to Title IX 20 U.S.C. §1681(a), *et seq.*, OSU owed Plaintiffs duties to act prudently and with reasonable care, and otherwise to promptly investigate all allegations of sexual harassment, sexual assault, and sexual abuse regarding Dr. Strauss as he was an OSU employee, faculty member, and Team Physician.

113. OSU subjected the Plaintiffs and other OSU students to Dr. Strauss, who sexually molested, assaulted, abused, and sexually harassed the Plaintiffs. This included, but is not limited to, the following: performing unwanted oral sex, fondling of their testicles, fondling of their penises, digitally penetrating their anuses, rubbing his erect genitals on their bodies during an examination, voyeuristically staring at them while they showered, making sexual comments and other inappropriate comments toward them, calling them at their residences, inviting them and taking them to lunch/dinner, and asking the Plaintiffs to take semi-nude photographs. All of these actions were all acts of sexual discrimination under Title IX.

114. OSU had actual knowledge of the serial and consistent sexual molestation, assault, abuse, and harassment and permitted it to continue unchecked throughout Dr. Strauss' employment.

115. From approximately 1979-1998, male student-athletes, male students, and coaches conveyed complaints and concerns regarding Dr. Strauss' inappropriate sexual conduct to OSU administrators and employees.

116. Given the magnitude of Dr. Strauss' abuse-involving students and student athletes he evaluated and treated over the span of two decades, it would be implausible for OSU to claim that it did not know about Dr. Strauss' sexual abuse.

117. OSU was required to promptly investigate and address Plaintiffs' (and other OSU students') allegations, reports and/or complaints of other unwelcome, inappropriate touching and comments by Dr. Strauss, but OSU did not do so.

118. OSU created and was deliberately indifferent to a sexually hostile culture withing its athletic and student health programs, by, among other things:

   a. Mishandling students' reports about Dr. Strauss' conduct and/or discouraging students from reporting Dr. Strauss's conduct:

   b. Failing to promptly and appropriately investigate, remedy, and respond to complaints about Dr. Strauss' conduct;

   c. Promoting Dr. Strauss and increasing his access to OSU students, despite students' complaints about Dr. Strauss' conducts;

   d. Failing to adequately supervise Dr. Strauss, after learning that he posed a substantial risk to the safety of male students and student-athletes;

   e. Failing to take corrective action to prevent Dr Strauss from sexually harassing other students;

   f. Requiring student-athletes to see Dr. Strauss for annual physicals and medical treatment in order to participate in university sports to maintain their athletic scholarships, even after student-athletes complained to athletic directors, coaches, and trainers about the ways Dr. Strauss touched them during medical examinations;

g. Threatening male athletes' participation in OSU sports if they refused to get physicals and/or medical treatment from Dr. Strauss;

h. Joking about Dr. Strauss' conduct with other student-athletes; and

i. Falsely representing to at least one student who reported sexual harassment by Dr. Strauss that there had been no prior complaints about Dr. Strauss and that OSU Student Health had only received positive comments about Dr. Strauss;

119. OSU willfully allowed Dr. Strauss to prey amongst its male student-athletes and male students, even though many high-ranking officials such as Athletic Directors, Assistant Athletic Directors, Associate Athletic Directors, Head Team Physicians, Team Physicians, and Athletic Trainers could have acted to prevent this systemic sexual abuse.

120. OSU failed to respond promptly and adequately to address the sexual misconduct of Dr. Strauss and to protect its male student-athletes and male students, which is a blatant violation of Title IX.

121. OSU, through its acts and omissions, acted with deliberate indifference to the sexual molestation, assault, abuse, and harassment that the Plaintiffs as well as other male OSU students endured. OSU failed to respond to the sexual misconduct of Dr. Strauss and their inaction was clearly unreasonable in light of the known circumstances.

122. OSU's failure to promptly respond, investigate, and act to investigate complaints and then remedy the situation created by their employee, faculty member, and Team Physician, Dr. Strauss, caused the Plaintiffs to experience further sexual molestation, assault, abuse, and harassment and/or made the Plaintiffs more vulnerable to it into the future.

123. OSU's failure to promptly respond, investigate, and act to investigate complaints and then remedy the situation created by their employee, faculty member, and Team Physician, Dr. Strauss, created a sexually hostile environment that effectively denied Plaintiffs access to educational opportunities and benefits at OSU, including appropriate medical care. OSU's deliberate indifference was so severe, pervasive, and objectively offensive that it deprived the Plaintiffs of access to the educational opportunities or benefits provided by OSU.

124. As a direct and proximate cause of OSU's blatant violation of Title IX as well as the rights bestowed to Plaintiff's under Title IX, Plaintiffs have suffered and continue to suffer emotional distress, physical manifestations of emotional distress, mental anguish, fear, depression, anxiety, trauma, disgrace, embarrassment, shame, humiliation, loss of self-esteem, and loss of enjoyment of life, which will continue into the future. Also, Plaintiffs were prevented from and continue to be prevented from obtaining the full enjoyment of life. Plaintiffs have sustained and continue to sustain loss of earnings and earning capacity. Finally, Plaintiffs have incurred various personal expenses.

125. OSU's creation of and deliberate indifference to the sexually hostile culture within its athletic and student health programs substantially increased the risk that Plaintiffs and other OSU students would be sexually harassed.

126. The sexual harassment that Plaintiffs suffered was so severe, pervasive and objectively offensive that it effectively barred their access to educational opportunities and benefits, including a safe educational environment and appropriate medical care.

## LARKINS HALL

127. The Plaintiff OSU wrestlers mainly trained in their respective sport in Larkins Hall. As such, these Plaintiff OSU wrestlers were entitled to use the athletic facilities at Larkins Hall free from sexual molestation, assault, abuse, and harassment.

128. OSU owed these Plaintiffs a duty to investigate and remedy the conditions that made Larkins Hall a sexually hostile and abusive environment.

129. OSU had actual knowledge of the hostile sexual environment at Larkins Hall. The Athletic Director, Assistant Athletic Directors, Associate Athletic Directors, and/or Building Supervisor had actual knowledge of the hostile environment and these individuals had the authority to take corrective action as individuals using the facility were required to be students, faculty, staff, and/or employees of OSU. Yet, these individuals failed any opportunity to rectify the hostile environment at Larkins Hall.

130. Also, OSU was deliberately indifferent to this hostile environment even though OSU exercised control over Larkins Hall. In fact, this environment was so severe, pervasive, and objectively offensive that it deprived the Plaintiff wrestlers of access to their educational opportunities and/or benefits provided by OSU.

131. Numerous complaints were made by the Plaintiff wrestlers to the former OSU Wrestling Coaches. Athletic Director, an Assistant Athletic Director, and other high-ranking OSU employees. These complaints included but were not limited to the following:

    a. Dr. Strauss was ogling and gawking male student athletes at Larkins Hall while they showered or were in the locker room;

    b.  Dr. Strauss was showering with male student athletes for hours at a time, several times a day;

    c.  Dr. Strauss was making sexual comments and other inappropriate comments to the male students. In addition, he was calling them at their residences inviting them to dinner, asking them to take semi-nude photographs, and inviting them to his home;

    d.  Larkins Hall was a toxic, sexualized place where male voyeurs gathered to gawk and stare and masturbate as the male student athletes showered or stood naked in the locker room, and

    e.  Male OSU students were openly having sex with each other on the stairwells and other places in Larkins Hall.

## SECOND CAUSE OF ACTION – VIOLATIONS OF TITLE IX, 20 U.S.C. §1681(a), *et seq.*

### Deliberate Indifference to Prior Sexual Harassment

132.  Plaintiffs incorporate by reference the allegations set forth and contained in Paragraphs One (1) through Paragraphs One Hundred and Twenty-Eight (128) as if fully written herein.

133.  Before Dr. Strauss sexually harassed the Plaintiffs, OSU had actual knowledge of Dr. Strauss's prior sexual harassment of male students at OSU.

134.  Based on Dr. Strauss's prior conduct, OSU had actual knowledge of the substantial risk that Dr. Strauss would sexually harass other male students at OSU.

135.  OSU officials, with the knowledge described above, had the authority to address the risk posed, by Dr. Strauss, and had the authority to take corrective measures by, among

other things, closely supervising Dr. Strauss, not allowing him to shower with student-athletes, or terminating his employment.

136. OSU's failure to address the substantial risk posed by Dr. Strauss, given prior complaints and reports about his inappropriate conduct, was clearly unreasonable in light of the known circumstances.

137. By its acts and omissions, OSU was deliberately indifferent to the substantial risk that Dr. Strauss would sexually harass other male students at OSU.

138. As a result of OSU's deliberate indifference, Plaintiffs were subjected to severe sexual harassment by Dr. Strauss, including sexual assault in the guise of medical care.

139. The sexual harassment that Plaintiffs suffered was so severe, pervasive, and objectively offensive that it deprived Plaintiffs of access to educational opportunities and benefits, including a safe educational environment and appropriate medical care.

140. As a direct and proximate result of OSU's deliberate indifference to Dr. Strauss's prior sexual harassment of OSU, which violated Title IX, Plaintiffs have suffered damages and injuries and will continue to suffer damages and injuries into the future.

## THIRD CAUSE OF ACTION – FRAUDULENT CONCEALMENT
## BY THE OHIO STATE UNIVSERITY

141. The Plaintiffs hereby incorporate by reference Paragraph One (1) through Paragraphs One Hundred and Thirty-Seven (137) as fully written herein.

142. Plaintiffs hereby allege that OSU committed Fraudulent Concealment by committing Fraud, as previously described in detail in this Amended Complaint and also described hereafter.

143. OSU concealed the existence of Plaintiffs' claims, by making material representations to Plaintiffs involving past or existing facts at the time of Dr. Strauss' sexual assaults, by representing, insinuating or doing the following:

    a. Defendant Strauss' examinations were "medically appropriate"; and

    b. Defendant Strauss' conduct was "not sexual abuse"; and

    c. Continuing to employ Dr. Strauss as a medical doctor thereby representing that Strauss was not a sexual deviant despite actual and/or constructive knowledge that he was a sexual deviant who engage in acts of sexual abuse at the OSU Student Health Center, Larkins Hall, and other buildings at the OSU campus.

144. These material representation(s) to Plaintiffs were false, in that OSU had actual knowledge of sexual abuse by Dr. Strauss from other students and student athletes on the OSU campus and knew that the appropriateness of his "treatment(s)" had been questioned in the past. Further, OSU continued to employ Dr. Strauss, thereby providing him unfettered access to hundreds of males including Plaintiffs.

145. OSU made the material representations(s) with the intent that the material representation(s) should be acted upon by each Plaintiff, and that each Plaintiff should believe the following:

    a. That the "treatments" were in fact "treatments;"

    b. That the "treatment(s)" or examinations were proper, appropriate, and legitimate;

    c. That he had not been sexually assaulted;

    d. That he should believe Dr. Strauss was a legitimate doctor who did not commit sexual assault; and

e. That he should not reasonably believe and not be aware of a possible lawsuit or cause of action that he might have against OSU.

146. Plaintiffs acted in reliance upon the material representations(s), in that the Plaintiffs reasonably believed the following:

a. That the "treatments" were in fact "treatment";

b. That the "treatment" or examinations were proper, appropriate, and legitimate;

c. That they had not been sexually assaulted;

d. That they should continue the "treatment(s);"

e. That Dr. Strauss was a legitimate doctor who did not engage in sexual assault;

f. That they did not have and were not aware of a possible lawsuit or cause of action that they had against OSU.

147. Plaintiffs thereby were injured, in that Plaintiffs suffered in the following ways:

a. Plaintiffs could not stop the sexual assault;

b. Plaintiffs continued to undergo the "treatment(s)" or examinations resulting in sexual assaults; and

c. Some Plaintiffs suffered related physical manifestations thereof, such as sleep deprivation, physical illness, severe emotional distress, loss of familial relationships, loss of enjoyment of life. In addition, some Plaintiffs will continue to suffer pain of the mind and body, and will continue to be prevented from performing daily activities and obtaining full enjoyment of life. Further, some Plaintiffs will continue to sustain loss of earnings and earning capacity.

148. OSU concealed the fraud as to Dr. Strauss by making fraudulent material representations to Plaintiffs that were designed and/or planned to prevent inquiry and escape investigation and prevent subsequent discovery of this fraud as to Dr. Strauss.

149. OSU continued to employ Dr. Strauss as a medical doctor thereby representing that Strauss was not a sexual deviant despite actual and/or constructive knowledge that he was a sexual deviant who engaged in acts of sexual abuse on OSU students at the OSU Student Health Clinic, Larkins Hall, and other buildings on the OSU campus.

150. Dr. Strauss published the following articles in regards to Anabolic Steroids while employed at OSU:

    a. **Side Effects of Anabolic Steroids in Weight-Trained Men**

      Richard H. Strauss, J.E. Wright, G.A. Finerman, D.H. Catlin.

      Phys Sportsmed, December, 1983

    b. **Anabolic Steroids**

      Richard H. Strauss.

      Clinical Sports Medicine. July, 1984

    c. **Anabolic Steroid Use and Perceived Effects in Ten Weight-Trained Women Athletes**

      Richard H. Strauss, M.T. Liggett, R.R. Lanese.

      The Journal of the American Medical Association (JAMA), May, 1985

    d. **Controlling the Supply of Anabolic Steroids**

      Richard H. Strauss.

      Phys Sportsmed, May 1987

e. **Selected Psychological Characteristics of Anabolic-Androgenic Steroid Users**

M.S. Bahrke, J.E. Wright, J.S. O'Connor, Richard H. Strauss, D.H. Catlin.New England Journal of Medicine, September. 1990

f. **Anabolic Steroids in the Athlete – Annual Review of Medicine** 1991 – Paper adopted in part from the authors' chapter "Drugs in Sports" in Sports Medicine, edited by Richard H. Strauss Philadelphia: Saunders (1991) 2nd Edition

g. **Endrocrine Effects in Female Weight Lifters Who Self-Administer Testosterone and Anabolic Steroids**

W.B. Markley, Richard H. Strauss, D.J. Leizman, M. Liggett, L.M. Demers, November, 1991

h. **Psychological Moods and Subjectivity Perceived Behavioral and Somatic Changes Accompanying Anabolic-Androgenic Steroid Use**

M.S. Bahrke, J.E. Wright, Richard H. Strauss, D.H. Catlin. American Journal of Sports Medicine, November – December 1992

151. Dr. Lombardo, OSU head team physician, authored or co-authored the following articles in regards to Anabolic Steroids while employed at OSU:

a. **The Effects of Anabolic Steroids and Strength Training on the Human Immune Response**

Calabrese LH, Kleiner SM, Barna BP, Skibinski CL, Kirkendall DT, Lahita RG, John A. Lambardo

Medicine and Science in Sport and Exercise August 1989

b. **Anabolic-Androgenic Steroids**

JA Lombardo NIDA Research Monograph 1990

c. **Anabolic Steroids in Athletes**

Yesalis CE, Wright JE John A. Lombardo

Wien Medizinishe Wochenschrift 1992 German

d. **Psychiatric Effects and Psychoactive Substance Use in Anabolic-Androgenic Steroid Users**

Malone DA Jr., Dimeff RJ, John A. Lombardo, Sample RH Clinical Journal of Sports Medicine 1995

e. **Steroids and Steroid-Like Compounds**

Blue, JG, John Lombardo

Clinics in Sports Medicine Journal 1999 July

f. **Performance-Enhancing Supplements**

Pecci MA, John A. Lombardo

Physical Medicine and Rehabilitation Clinics of North America November 2000

g. **Supplements and Athletes**

John A. Lombardo

Southern Medical Journal September 2004

152. Numerous Plaintiffs state that they received and/or witnessed Dr. Strauss administering steroids and/or performance enhancing drugs to athletes at OSU in order for the athletes to "get an edge." These drugs include but are not limited to: Ephedrine, Creatine, Clenbuterol, and "Animal Juice," a name given to an unknown substance that's label stated, "for animal use only." Plaintiffs state that not only did Strauss

regularly administer Anabolic Steroids, but athletes at OSU were also able to receive injections of Corticosteroids like Decadron in order to immediately cure the athletes' pain and keep the OSU athletes running at a high level at all times.

153. Numerous Plaintiffs state that Dr. Strauss told athletes that the substance would boost their athletic performance. However, rarely was any OSU athlete ever taking any of these drugs listed above, counseled by Dr. Strauss as to any potential side effects that the steroid and/or performance enhancing drug might have. In fact, in a 1983 article titled Social Factors in Wrestlers' Health Problems, written by Dr. Strauss and published in *The Physician and Sportsmedicine,* Dr. Strauss discussed that wrestlers were highly motivated by social pressures to win. Further, he stated, "[w]restlers tend to take seriously only those health problems that prevent participation, regardless of the long-term consequences."

154. On information and belief, Plaintiffs state that Dr. Strauss was receiving the steroids and/or performance enhancing drugs that he distributed from the OSU Athletes from the OSU Student Health Center.

## FOURTH CAUSE OF ACTION – VIOLATIONS OF TITLE IX, 20 U.S.C. §1681(a), *et seq.*
### Unlawful Retaliation Claim

155. The Plaintiffs hereby incorporate by reference the allegations set forth and contained in Paragraphs one (1) through Paragraphs One Hundred and Fifty-One (151) as if fully written herein.

156. Retaliatory conduct is within the broad prohibition of discrimination made unlawful by Title IX.

157. In March of 2018, Michael DiSabato was one of the original whistleblowers as to Dr. Strauss and OSU's complicit role in covering up the sexual environment at OSU. He disclosed to OSU and the public the rampant sexual molestation, assault, abuse, and harassment that had occurred at OSU by Dr. Richard Strauss.

158. In approximately April 2018, due to Michael DiSabato being a whistleblower as set forth above, he received a refund of $1,500 from OSU personnel for six (6) tickets that he purchased at the John Hick's fundraiser Unlimited Love so that Michael DiSabato and his guests could attend an OSU Spring Football Practice and meet Coach Urban Meyer.

159. OSU had knowledge of Whistleblower Michael DiSabato's reports and disclosures of the rampant sexual molestation, assault, abuse, and harassment to the extent that in May of 2018 OSU hired an independent law firm, Perkins Coie L.L.P. of Seattle, Washington, to investigate the allegations of Michael DiSabato.

160. In Spring of 2018, OSU personnel hung up a picture of the Whistleblower Michael DiSabato in the OSU Steelwood Athletic Training Facility, which housed the OSU Wrestling Team, OSU Fencing Team, OSU Gymnastics Team, and the Ohio Regional Olympic Training Center for Wrestling. The picture of Whistleblower DiSabato was intentionally placed in a noticeable area to inform everyone to avoid Whistleblower DiSabato and not to let Whistleblower DiSabato into the facility. Such photo served notice and was equivalent to a "wanted poster." Also, upon information and belief, the OSU Wrestling Team talked about Whistleblower DiSabato in team meetings.

161. In July 2018, Matt Finkes, Director of Development for the OSU Wexner Medical Center, Executive Director of the Gold Pants Club, former OSU Football player and

second cousin to former OSU Wrestling Head Assistant Coach Jim Jordan, gave a public interview on Columbus radio station QFM 96.3. During this interview, Matt Finkes, an OSU employee tried to paint a derogatory picture of the Plaintiffs and similarly situated Plaintiffs as he stated that the reports concerning Dr. Strauss and OSU were a money grab as "guys saw dollar signs and are going for it." Also, OSU employee, Matt Finkes, pointed out that he did not think OSU is "gonna roll over the same way" as Michigan State had done. Further, during his interview, OSU employee Matt Finkes stated that "voices are being muted by Mike DiSabato and all these guys that are coming out taking away from guys that might actually be abused." Finally, OSU employee Matt Finkes stated that people needed to look through a prism of facts and "this is way out of bounds."

162. In the summer of 2018, OSU employees, faculty, staff, former employees of OSU, friends and/or benefactors of OSU emailed, texted, and/or called some of the Plaintiffs and similarly situated Plaintiffs in order to get the Plaintiffs and similarly situated Plaintiffs to not reveal their individual stories and/or to silence them. These individuals include, but are not limited to the following: Former OSU Head Wrestling Coach Russ Hellickson, Former Head Assistant Wrestling Coach Jim Jordan, Former OSU National Champion Wrestler and OSU Business Licensee, Tommy Rowlands, Current OSU Head Wrestling Coach Tom Ryan, and OSU's Director of Development for the OSU Wexner Medical Center, Executive Director of the Gold Pants Club, former OSU Football player and second cousin to former OSU Head Assistant Coach Jim Jordan, Matt Finkes. These listed individuals called, texted, and emailed numerous former athletes of the OSU Wrestling team in the hopes of accessing the damage to OSU

and/or themselves as well as attempting to continue the cover-up of Dr. Strauss and the sexually deviant culture and environment at OSU from 1979-1998. In fact, there was an active campaign to silence and intimidate Whistleblower DiSabato and any other Plaintiffs that stepped forward in regards to Dr. Strauss, the sexually deviant culture and environment at OSU from 1979-1998, and the cover-up by OSU personal officials who knew about Dr. Strauss' sexual harassment.

163. Further, OSU employees, faculty, staff, former employees of OSU, friends and/or benefactors of OSU emailed, texted, and/or called some of the Plaintiffs and similarly situated Plaintiffs in order to assess the extent of the damage that Defendant OSU could face in a possible lawsuit.

164. Former OSU Head Assistant Wrestling Coach Jim Jordan and current U.S. Congressman used a public relations firm, Shirley & Banister Public Affairs to distribute statements and set up a website presenting support for Congressman Jordan as there were public allegations by some OSU wrestlers that when Congressman Jim Jordan was the OSU Head Assistant Wrestling Coach, the wrestlers had told him about Dr. Strauss and how Dr. Strauss was conducting physical and medical examinations on the wrestlers. Former OSU Head Wrestling Coach Russ Hellickson and Congressman Jim Jordan directed former OSU wrestlers to call the above public relations firm to issue statements in support of Jim Jordan and/or recant their previously given press statements regarding Dr. Strauss, the sexually deviant culture and environment at OSU from 1979-1998, and the cover-up by those who knew about it. Simply put, former OSU wrestlers were being asked to stay silent.

165. Congressman Jim Jordan and a local sports agent, who represents a former OSU Football Player, Bret Adams called Whistleblower/Plaintiff Mark Coleman's elderly parents in order to have Plaintiff Coleman's elderly parents apply pressure to Plaintiff Coleman to recant his previous statement made to a Wall Street Journal reporter regarding Former OSU Head Assistant Coach Jim Jordan. Plaintiff Coleman had stated to this reporter, "[t]here's no way unless he's got dementia or something that he's got no recollection of what was going on at Ohio State." Also, a number of unknown individuals were conversing with Plaintiff Coleman's ex-girlfriend and mother of his child about applying pressure to Plaintiff Coleman to recant his previous statements and separate himself from Whistleblower DiSabato. Eventually, Plaintiff Coleman met with sports agent, Bret Adams and the mother of his child to sign a previously prepared statement to recant the previous statements Plaintiff Coleman had given to the Wall Street Journal reporter.

166. On or about February 2021, freelance writer and long-time writer, Jeff Snook, reported that it has not been documented nor is it reliable testimony that Dr. Strauss, ever once intended to, or examined or treated any Ohio State football player in his 21 years on campus. This abuse scandal centered mostly on the wrestling program, as well as a few other non-revenue sports. "Dr. Strauss never had any contact with the football program or with any of its players," Larry Romanoff, an assistant athletic director who oversaw academics for the program from 1975 until he retired just two years ago, told Mr. Snook. Mr. Romanoff further stated, "For anyone to claim otherwise is just false. But that's somewhat typical of today's media." Also, Dr. Chris Kaeding, a leading OSU football team doctor since 1991 stated, "I am not aware he ever had anything to

do with football." "He just was not associated with football. He was working out of Larkins Hall all those years, far away from the football program." Finally, Mr. Snook stated that apparently, a few former football players, none of the names the average fan would recognize, have come forward and signed their name to these accusations, perhaps hoping for an instant cash grab—and Sports Illustrated has run with it as gospel.

167. On information and belief, OSU has not taken disciplinary action against any of these OSU employees, faculty, staff, former employees of OSU, friends and/or benefactors of OSU that emailed, texted, and/or called some of the Plaintiffs and similarly situated Plaintiffs. As such, OSU has ratified these individuals' actions and independently violated Title IX.

168. As a direct and proximate result of OSU's retaliation, the Plaintiffs are aware of other similarly situated males who have failed to come forward for fear of retaliation from OSU. Plaintiffs are aware of many of their teammates that have chosen not to join this lawsuit due to the retaliation by OSU and its employees, faculty, staff, former employees of OSU, friends and/or benefactors of OSU.

169. As a direct and proximate result of OSU's retaliation, the Plaintiffs have suffered and continued to suffer emotional distress, physical manifestations of emotional distress, mental anguish, fear, depression, anxiety, trauma, disgrace, embarrassment, shame humiliation, loss of self-esteem, and loss of enjoyment of life.

170. As a direct and proximate cause of OSU's violation of Plaintiffs rights under Title IX, the Plaintiffs were prevented and continue to be prevented from obtaining the full

enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity, and incurred various personal expenses.

**FIFTH CAUSE OF ACTION – VIOLATION OF SECTION 1983 (42 U.S.C. §1983)**

171. The Plaintiffs hereby incorporate by reference the allegations set forth and contained in Paragraphs One (1) through Paragraphs One Hundred and Sixty-Seven (167) as if fully written herein.

172. Plaintiffs enjoys protections under the Fourteenth Amendment of the United States Constitution.

173. Plaintiffs enjoy the constitutionally protected Due Process right to be free from invasion of bodily integrity through sexual assault, battery, molestation, and harassment under the Fourteenth Amendment to the United States Constitution.

174. At all times herein, Ohio State and its employees, agents, and/or representatives were acting under color of law, to wit, under color of statutes, ordinances, regulations, policies, customs, and usages of The Ohio State University and State of Ohio.

175. The acts as alleged throughout this Complaint demonstrate a violation of these constitutionally protected rights, which were clearly established at the time of the acts and of which OSU had knowledge.

176. OSU had the ultimate responsibility and authority to train and supervise its employees, agents, and representatives, in the appropriate manner of preventing, detecting, investigating and reporting sexual abuse, assault, and molestation and as a manner of custom, policy, and/or practice failed to do so with deliberate indifference.

177. At all times pertinent herein, OSU acted in supervisory role to Dr. Strauss.

178. By failing to prevent the repeated sexual assaults, abuse, and molestation and other sexual deviant acts upon the Plaintiffs, and by failing to appropriately respond to numerous reports of Dr. Strauss' sexual assault, abuse, and molestation in a manner that was clearly unreasonable it amounts to deliberate indifference for which, OSU is liable to Plaintiffs pursuant to 42 U.S.C. §1983.

179. OSU is also liable to Plaintiffs under 42 U.S.C. §1983 for maintaining customs, policies, and practices that deprive Plaintiffs of rights secured by the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. §1983.

180. As a direct and proximate result of OSU's violation of Plaintiff's rights under 42 U.S.C. §1983, Plaintiffs have suffered and continue to suffer emotional distress, physical manifestation of emotional distress, mental anguish, fear, depression, anxiety, trauma, disgrace, embarrassment, shame, humiliation, loss of self-esteem, and loss of enjoyment of life; were prevented and continue to be prevented from obtaining the full enjoyment of life; and have incurred various personal expenses.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs respectfully requests this Honorable Court:

a. Enter judgment in favor of Plaintiffs on their First, Second, Third and Fourth Causes of Action under Title IX, 20 U.S.C. §1681(a), *et seq*. against Defendant, The Ohio State University;

b. Declare Defendant The Ohio State University's conduct in violation of Title IX of the Education Amendments of 1972;

c. Declare Defendant The Ohio State University's conduct in violation of 42 U.S.C. §1983;

d. Award Plaintiffs compensatory damages in amounts to be established at trial, including, without limitation, payment of Plaintiffs' medical and other expenses incurred as a consequence of the sexual abuse and/or harassment, OSU's deliberate indifference, OSU's fraudulent concealment, and OSU's unlawful retaliation; damages for deprivation of equal access to the educational opportunities and benefits provided by OSU; and damages for past, present, and future emotional pain and suffering, ongoing mental anguish, loss of past, present and future enjoyment of life, and loss of future earnings and earning capacity;

e. Award Plaintiffs pre-judgment and post-judgment interest;

f. Award Plaintiffs their court costs and expenses, including attorney's fees, pursuant to 42 U.S.C. § 1988 (b); and

g. Grant such other relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues in the above-mentioned Complaint.

Respectfully submitted,

J.C. Ratliff (0027898)
Rocky Ratliff (0089781)
*Attorneys for Plaintiffs*
200 West Center Street
Marion, Ohio 43302
Telephone:    740.383.6023
Facsimile:    740.383.2066
Email:   attorneys.ratliff@gmail.com